In The

Court of Appeals

For The

First District of Texas

____________


NO. 01-06-00624-CV

____________


GARRY L. PLOTKIN, Appellant


V.


CHARLES L. JOEKEL, INDIVIDUALLY AND D/B/A TRENDSETTER
STAFFING, INC.; TEXAS STAFFING SERVICES, INC. D/B/A
TRENDSETTER STAFFING; KENNETH JOEKEL, INDIVIDUALLY AND
D/B/A AMERICA'S SKILLED PERSONNEL; AND F.W. SERVICES, INC.
Appellees


* * *


CHARLES L. JOEKEL, INDIVIDUALLY AND D/B/A TRENDSETTER
STAFFING, INC., AND KENNETH JOEKEL, INDIVIDUALLY AND D/B/A
AMERICA'S SKILLED PERSONNEL, Appellants


V.


GARRY L. PLOTKIN; CHAD PLOTKIN; CJP FINANCIAL SERVICES,
INC.; CJP RESOURCES, INC.; AND YOUR RECRUITERS, INC., Appellees







On Appeal from the 133rd District Court 

Harris County, Texas

Trial Court Cause No. 2004-25108

 




O P I N I O N



 This is a dispute among various people and entities engaged in various
employee staffing businesses. The parties asserted claims, counterclaims, and third-party claims. Each party against whom any claim had been asserted moved for
traditional or no-evidence summary judgment. The trial court granted all summary-judgment motions and rendered a take-nothing judgment against all claims asserted
by any party. We determine whether the trial court erred in doing so. We affirm the
judgment in part, reverse it in part, and remand the case.

Background


A. The Primary People and Businesses

 Garry Plotkin and Charles Joekel were friends who had known each other for
many years. Garry's son was Chad Plotkin, and Charles's son was Kenneth Joekel.



 Garry and Charles began doing business together in the 1980s. In 1990,
Charles transferred to Garry his payroll-services business, (1) called Able Ones of
Texas, Inc.. Garry took over the business under a new corporation that he formed,
called Texas Personnel Services. Texas Personnel Services eventually became
Westbury Worldwide Services, Inc. d/b/a Worldwide Services ("Worldwide") some
time before 1998. The parties dispute whether Worldwide, which began as a staff-leasing business, later began operating a skilled-labor business, (2) as well.

 Charles owned, and was sole officer of, Texas Staffing Services, Inc. ("Texas
Staffing") d/b/a Trendsetter Staffing and d/b/a Trendsetter Skilled. The parties
represent that Texas Staffing handled its staff-leasing business under its Trendsetter
Staffing d/b/a, whereas Texas Staffing handled its skilled-labor business under its
Trendsetter Skilled d/b/a.

B. The Sale

 On June 8, 1998, Garry, through an attorney's letter, proposed to sell
Worldwide's book of business, its goodwill, and its furniture, fixtures, and
equipment. That letter read:

 Dear Charles,


 Garry has requested that I make the following proposal to you
regarding the referenced sale:


 1. Charles will purchase the good will of Worldwide
for $150,000.00 to be payable at closing.


 2. Trendsetter Staffing will purchase all furniture,
fixtures and equipment from Worldwide for
$50,000.00 to be payable at closing.


 3. Charles will purchase the client list and book of business
from Worldwide for a total of 1,500,000.00. . . .


 4. If Trendsetter is sold prior to December 31, 1999,
Worldwide will receive 25% of the net sale proceeds
less any amounts which have already been paid to
Worldwide in a total amount not to exceed
$2,500,000.00.


 . . .

(Emphasis added.)

 On June 11, 1998, Charles counter-offered by letter. The letter read:

 Dear . . . Garry:

 Thank you for the proposal regarding the purchase of Worldwide
Services' book of business.


 Notes:


 1. Any purchase of Trendsetter Staffing will be a structured pay-out
based upon a client retention; therefore, any agreement not
similarly predicated would be imprudent on my part.


 2. The only parties to this Agreement are Charles and Garry,
individually, and the terms of this Agreement are private and
confidential between them.


 . . .


 Having put my footnotes first, let me address your proposal paragraph
by paragraph:


 Paragraph #1: Okay.


 Paragraph #2: Okay.


 Paragraph #3: On June 29, 1998, Charles will take control of the
Worldwide book of business. Each week thereafter, Charles will pay
Garry an amount equal to one and one-half percent (1½ %) of the gross
sales provided by those accounts formerly serviced by Worldwide per
a list of accounts to be agreed upon. This will continue for 48 months
or until $2 Million is paid to Garry, whichever occurs first. Garry may
add to the "Worldwide accounts" at any time and will assist as called
upon in the maintenance of said accounts to our mutual benefit.


 Paragraph #4: In the event Charles sells Trendsetter during the term of
this Agreement, this Agreement will be terminated as follows: Charles
will pay Garry the lesser of 1) $2,500,000.00 less amounts previously
paid or 2) twenty-five percent (25%) of the gross sales price of
Trendsetter less amounts previously paid.


 . . .

(Emphasis added.)

 On June 16, 1998, Garry and Charles executed two contracts: (1) an
"Agreement" and (2) a "Bill of Sale." The Agreement, which concerned the sale of
Worldwide's book of business, provided as follows:


 The following represents our agreement regarding the sale by
Westbury Worldwide Services, Inc. d/b/a Worldwide Services
("Worldwide") of its book of business to CHARLES L. JOEKEL upon
the following terms and conditions:


 CHARLES JOEKEL agrees to buy and GARRY PLOTKIN agrees
to sell the book of business of WORLDWIDE SERVICES totaling
approximately THIRTY MILLION AND NO/100 DOLLARS
($30,000,000.00) per year in annual sales and the sale price to be
received for said assets shall be paid as follows:


 1. JOEKEL/Trendsetter will take control of the Worldwide
book of business on June 29, 1998. Each week thereafter,
JOEKEL will pay PLOTKIN an amount equal to 1½% of
the gross sales of the accounts formerly serviced by
Worldwide per a list of accounts to be agreed upon
between the parties. This agreement will continue for
forty-eight (48) months ending in June, 2002 or until a total
of TWO MILLION AND NO/100 DOLLARS
($2,000,000.00) is paid to GARRY PLOTKIN, which ever
comes first. PLOTKIN may add to the worldwide accounts
at any time during the agreement and will assist
JOEKEL/TRENDSETTER as called upon in the
maintenance of said accounts to the mutual benefit of the
parties.


 2. In the event that JOEKEL sells Trendsetter during the term
of this agreement . . . , this agreement will be terminated. 
JOEKEL will pay PLOTKIN at that time the lesser of:


 (1) TWO MILLION FIVE HUNDRED THOUSAND
AND NO/100 DOLLARS ($2,500,000.00) less any
amounts previously paid or


 (2) Twenty-five percent (25%) of the gross sales price
received for Trendsetter less any amounts previously
paid to GARRY PLOTKIN.


 . . .


 BY: /s/ BY: /s/ 

 GARRY L. PLOTKIN CHARLES L. JOEKEL


(Emphasis added.) 

 The Bill of Sale, which was executed the same day for the sale of Worldwide's
goodwill, furniture, fixtures, and equipment, provided in pertinent part as follows:

 KNOW ALL MEN BY THESE PRESENTS that WESTBURY
WORLDWIDE SERVICES, INC., D/B/A WORLDWIDE SERVICES
("Transferor"), in consideration of TWO HUNDRED THOUSAND
AND NO/100 DOLLARS ($200,000.00) and other good and valuable
consideration to be paid by TEXAS STAFFING SERVICE, INC. D/B/A
TRENDSETTER STAFFING ("Transferee") no later than December 31,
1998, we hereby sell, transfer, assign and convey unto Transferee . . . all
of the right, title and interest of Transferor in and to the furniture,
fixtures, equipment and goodwill of Transferor . . . .


 . . .


 

 WESTBURY WORLDWIDE SERVICES, INC.,
D/B/A WORLDWIDE SERVICES 



 BY: /s/ 

 GARRY L. PLOTKIN, PRESIDENT



 TEXAS STAFFING SERVICE, INC. D/B/A
TRENDSETTER STAFFING 


 BY: /s/ 

 CHARLES L. JOEKEL, PRESIDENT


(Emphasis added.)


 It is undisputed that, for the term of the agreement, Charles periodically
tendered 1½% commissions to Garry, but Garry did not take them. The parties
dispute why Garry declined to take his commissions. The parties also dispute
whether Worldwide's book of business that was sold contained only staff-leasing
accounts or contained both these accounts and skilled-labor accounts.

C. The Problem

 In April 2001, during the term of the Agreement, Charles sold Texas Staffing's 
staff-leasing business (operated under the d/b/a Trendsetter Staffing) to Simplified
Employment Services ("SES"). SES did not want to purchase Texas Staffing's
skilled-labor accounts. Before the sale of Texas Staffing's staff-leasing business to
SES, Charles sold or transferred all of Texas Staffing's skilled-labor accounts to F.W.
Services, Inc. d/b/a Pacesetter Personnel and d/b/a America's Skilled Personnel
("F.W. Services"), his son Kenneth's corporation. Garry received no commissions
from any of the skilled-labor accounts that were transferred to F.W. Services, nor did
he receive a percentage of the value of these accounts. The parties dispute the reason
for this. 

 SES purchased Texas Staffing's staff-leasing business for $3,000,000. After
having paid only $700,000 of the total sales price, SES filed for bankruptcy. The
remaining $2,300,000 was never paid. Charles paid Garry $175,000, which was 25%
of the $700,000 that SES actually paid. The parties dispute how much Garry was
owed from the sale to SES. The parties also dispute whether Garry was owed pre-sale
commissions.

D. The Involvement of Other Family Members and Employees

 Chad Plotkin owned, and was the officer and director of, two corporations that
provided factoring (3) to employee-leasing businesses: CJP Resources, Inc. ("CJP
Resources") and CJP Financial Services, Inc. ("CJP Financial"). Chad also owned
a third corporation, Your Recruiters, Inc. ("Your Recruiters"). CJP Financial
provided factoring services to a former F.W. Services employee, Terrell Diamond,
who left F.W. Services in the 1990s to start her own staff-leasing business. 

 Larry Plotkin, Garry Plotkin's twin brother, incorporated LWP Resources d/b/a
Huntington Resources, Inc. ("Huntington") to provide factoring services. Huntington
provided factoring services to Jeffrey Cash Cary, a former F.W. Services's employee 
who left in May 2002 to open a staff-leasing business in San Antonio.

 The parties dispute whether (1) Garry enticed Diamond and Cary away from
F.W. Services; (2) Garry enticed a third F.W. Services employee, Todd Murphy, to
leave the company in the 1990s to start a staff-leasing business; (3) Cary breached a
non-competition agreement with F.W. Services by opening a staff-leasing business
in San Antonio; and (4) Garry, Chad, CJP Financial, CJP Resources, and Your
Recruiters conspired to lure away these F.W. Services employees in order to profit
from providing factoring services to their new businesses.

E. The Suit

 In May 2004, Garry sued Charles, Texas Staffing, Kenneth, and F.W. Services. 
He sued Charles and Texas Staffing for, among other things, (1) breach of express
contract for failure to pay him 25% of the $3 million sales price to SES and for
transferring to Kenneth the skilled-labor accounts that had been Worldwide's without
compensation to Garry and (2) breach of fiduciary duty for converting commissions
that Charles had allegedly held for him under separate verbal agreement. Garry sued
Kenneth and F.W. Services for breach of implied-in-law contract, based on the theory
that Kenneth and F.W. Services knew that the skilled-labor accounts that Charles
transferred to them before the SES sale contained Worldwide skilled-labor accounts,
resulting in a fraudulent conveyance that unjustly enriched these defendants. Garry
also sued some or all of these defendants for fraud, Uniform Fraudulent Transfer Act (4)
("UFTA") violations, money had and received, quantum meruit, and quantum
valebant. He sought actual and punitive damages and disgorgement.

 Charles and Texas Staffing counterclaimed against Garry for (1) breach of
fiduciary duty; (2) fraud and misrepresentations, based on Garry's misrepresentations
that Worldwide's book of business was worth $30 million and that Garry would
continue to assist with Worldwide accounts after the Agreement's execution; and (3)
breach of contract, based on Garry's promise to continue to assist with maintenance
of Worldwide accounts.

 Kenneth and F.W. Services counterclaimed against Garry for (1) breach of
fiduciary duty for Garry's luring F.W. Services's employees away to establish
competing businesses for his or his family's profit; (2) tortious interference with
existing and prospective contracts, including interference with (a) existing staff-leasing contracts in Houston and San Antonio, (b) F.W. Service's non-competition
agreement with Cary, and (c) an agreed temporary injunction between Cary and F.W.
Services; (3) fraud, for misrepresentations (a) that Garry would be loyal and able to
maintain confidentiality of information obtained from these defendants, (b) that he
would not do anything to these defendants' business success, and (c) that he did not
have a continuing relationship with Cary, Diamond, or Murphy; and (4) conspiracy
to destroy their business by establishing factoring businesses to finance former F.W.
Services employees whom Garry had lured away for that purpose.

 Kenneth and F.W. Services also asserted third-party claims against Chad
Plotkin, CJP Financial, CJP Resources, and Your Recruiters for (1) tortious
interference with existing and prospective contracts, including interference with
existing staff-leasing contracts in Houston and San Antonio, with F.W. Service's non-competition agreement with Cary, and with an agreed temporary injunction between
Cary and F.W. Services, and (2) conspiracy to destroy their business by factoring the
new businesses of former F.W. Services employees whom Garry had lured away for
that purpose.

F. The Summary-Judgment Motions and Ruling

 Each party against whom any claim, counterclaim, or third-party claim had
been asserted moved for traditional or no-evidence summary judgment. There were
five summary-judgment motions filed in all. 

 The trial court granted all motions for summary judgment without stating its
reasons and rendered a take-nothing judgment on all claims, counterclaims, and third-party claims asserted by any party. The court denied Garry's motion for new trial.

Summary-Judgment Standards


 Traditional summary judgment under Texas Rule of Civil Procedure 166a(c)
is proper only when a movant establishes that there is no genuine issue of material
fact and that it is entitled to judgment as a matter of law. Gary E. Patterson &
Assocs., P.C. v. Holub, 264 S.W.3d 180, 190 (Tex. App.--Houston [1st Dist.] 2008,
pet. denied) (citing Randall's Food Mkts., Inc. v. Johnson, 891 S.W.2d 640, 644 (Tex.
1995) and Tex. R. Civ. P. 166a(c)). "A defendant is entitled to summary judgment
if the evidence disproves as a matter of law at least one element of each of the
plaintiff's causes of action or if it conclusively establishes all elements of an
affirmative defense." Id.

 "A party may move for a no-evidence summary judgment under Texas Rule of
Civil Procedure 166a(i) 'if there is no evidence of one or more essential elements of
a claim or defense on which an adverse party would have the burden of proof at
trial.'" Id. (quoting Flameout Design & Fabrication, Inc. v. Pennzoil Caspian Corp.,
994 S.W.2d 830, 834 (Tex. App.--Houston [1st Dist.] 1999, no pet.), and citing Tex.
R. Civ. P. 166a(i)). "The trial court must grant the motion unless the nonmovant
produces more than a scintilla of evidence raising a genuine issue of material fact on
the challenged elements." Id. "In determining whether a respondent to a no-evidence
motion for summary judgment has produced sufficient evidence to raise a genuine
issue of material fact, courts are not required to search the record without guidance." 
Aleman v. Ben E. Keith Co., 227 S.W.3d 304, 309 (Tex. App.--Houston [1st Dist.] 
2007, no pet.). "But 'the respondent is not required to marshal its proof; its response
need only point out evidence that raises a fact issue on the challenged elements.'" Id. 
(quoting Tex. R. Civ. P. 166a(i) cmt).

 "In reviewing the granting of either type of summary-judgment motion, we
indulge every reasonable inference from the evidence in favor of the nonmovant,
resolve any doubts arising from the evidence in its favor, and take as true all evidence
favorable to it." Patterson, 264 S.W.3d at 190. "When an order granting summary
judgment does not specify the grounds upon which the trial court ruled, we must
affirm if any of the summary judgment grounds is meritorious." Id. (citing
Star-Telegram, Inc. v. Doe, 915 S.W.2d 471, 473 (Tex. 1995)).

Garry's Appeal


 In a single issue, Garry raises several challenges to the summary-judgment
rendered on certain of his claims. He also concedes that he does not challenge other
claims and requests for damages or relief on which summary judgment was rendered.

A. Bases for Judgment Not Challenged on Appeal

 Garry does not appeal the summary judgment rendered on his claims for fraud,
UFTA violations, conspiracy, money had and received, quantum meruit, and quantum
valebant and on his requests for punitive damages and disgorgement, conceding that
he failed to respond to the no-evidence summary-judgment motion's grounds
attacking the elements of the cited claims, damages, and remedy. See Tex. R. Civ.
P. 166a(i) ("The court must grant the [no-evidence summary-judgment] motion
unless the respondent produces summary judgment evidence raising a genuine issue
of material fact."). Accordingly, we must affirm the summary judgment rendered on
these claims and requests for relief or damages. See Tricon Tool & Supply, Inc. v.
Thumann, 226 S.W.3d 494, 500 (Tex. App.--Houston [1st Dist.] 2006, pet. denied).

B. Breach of Express Contract

 Garry first contends that the trial court erred in rendering traditional and no-evidence summary judgment on his breach-of-express-contract claims against Charles
and Texas Staffing.

 1. Breach of the Verbal Agreement to Hold Garry's Commissions "in
Trust"


 A portion of Garry's appellate argument concerns the breach of a post-Agreement verbal contract for Charles to hold in trust Garry's 1½ % commissions on
former Worldwide accounts until Garry requested them. However, Garry did not
plead this as part of his express breach-of-contract claim. Instead, the sole express
contract that Garry's "live" petition alleged was that Charles and Texas Staffing had
breached was the Agreement itself, specifically, by not having paid Garry 25% of the
sale price of Texas Staffing accounts that were sold to SES and by not having
compensated him for former-Worldwide accounts that had been transferred to F.W.
Services. The only allegations that the live petition made concerning breach of a
post-Agreement verbal contract to hold Garry's commissions in trust appeared in
support of his claims for breach of fiduciary duty, UFTA violations, quantum
valebant, quantum meruit, and money had and received and his requested remedy of
disgorgement. 

 Texas follows a "fair notice" standard for pleading, in which the question is
whether the opposing party can ascertain from the pleading the nature and basic
issues of the controversy. Horizon/CMS Healthcare Corp. v. Auld, 34 S.W.3d 887,
896 (Tex. 2000). "The purpose of this rule is to give the opposing party information
sufficient to enable him to prepare a defense." Roark v. Allen, 633 S.W.2d 804, 810
(Tex. 1982). The test of fair notice is whether an opposing attorney of reasonable
competence, on review of the pleadings, can ascertain the nature and the basic issues
of the controversy and the testimony probably relevant. Bowen v. Robinson, 227
S.W.3d 86, 91 (Tex. App.--Houston [1st Dist.] 2006, pet. denied).

 We hold that under the facts of this case, Garry's breach-of-express-contract
allegations against Charles and Texas Staffing based on the Agreement did not give
fair notice of a breach-of-express-contract claim based on a subsequent, verbal
agreement to hold commissions. First, Garry's petition alleged generally that he had
accepted the commissions tendered under the Agreement, but that he had then entered
into a verbal agreement for Charles to hold them in trust. These are allegations of a
contract separate from the Agreement itself. The breach-of-express-contract
allegations referenced only the Agreement, not a separate, verbal contract concerning
commissions. Second, paragraph 2 of the Agreement entitled Garry to the lesser of
$2.5 million, less commissions already paid, or 25% of the sales price received. 
Garry's petition alleged that the commissions held under this later, verbal agreement
amounted to around $1.3 million. Two and a half million dollars less $1.3 million is
still greater than the gross sales price received for the sale of SES. Accordingly,
Garry's allegations limited his express-contract claim against Charles and Texas
Staffing for breach of the Agreement to 25% of the sales price received. Given that
the Agreement relegated him to this lesser sum, Garry's allegations did not provide
fair notice that he was also claiming breach of a completely separate verbal agreement
to hold commissions in trust.

 Garry nonetheless argues that the sufficiency of his pleading was demonstrated
by the fact that Charles and Texas Staffing's summary-judgment motion addressed
a verbal agreement to hold commissions. We disagree. In their summary-judgment
motion, Charles and Texas Staffing argued, under rule 166a(c), that

 Plaintiff's claim for express contract is based only on (1) amounts
allegedly due upon sale of Trendsetter Staffing and (2) amounts
allegedly due as a consequence of an alleged transfer of accounts to
Kenneth Joekel. The claim conspicuously fails to include any allegation
with respect to the non-payment of commissions. Nonetheless, even if
the Court were inclined to read Plaintiff's pleadings to allege a claim
for breach of contract based on commissions (and the Trendsetter
Defendants object to and oppose such a reading), such claim fails as a
matter of law . . .  .


(Emphasis added.) Instead of showing that Charles and Texas Staffing read the
petition to allege a breach-of-express-contract claim for breach of an oral agreement
to hold commissions, this text shows that they did not read the petition that way, that
they opposed any reading of the petition to include such an allegation, and that they
addressed the issue only in the event that the court read the petition otherwise. After
being put on notice that his petition did not allege such a theory, Garry declined to
amend it to include such an alternative claim.

 We overrule Garry's challenges that are based on this unpleaded express
contract claim.

 2. Breach of the June 18, 1998 Agreement


 Garry also argues that the trial court erred in rendering a take-nothing summary 
judgment on his claim that Charles and Texas Staffing breached the Agreement by
failing to pay him (1) 25% of the sale price of Texas Staffing accounts that were sold
to SES and (2) compensation for the former-Worldwide accounts that were
transferred to F.W. Services before the sale to SES. 

 a. Failure to Pay Garry for 25% of the Sale Price of the Texas
Staffing Accounts to SES


 The Agreement required that, upon sale of "Trendsetter" during the contract
term, Charles would pay Garry the lesser of $2.5 million or "Twenty-five percent
(25%) of the gross sales price received for Trendsetter less any amounts previously
paid to GARRY PLOTKIN." Garry contends that a fact issue exists regarding what
the phrase "gross sales price received" means: the price of sale (Garry's
interpretation--$3 million), or the amount of the sale price that the buyer actually
paid (Charles's interpretation--$700,000). Specifically, Garry reads "gross sales
price received" to mean "gross sales price to be received by the seller under the sales
contract." Garry appears to argue both that the Agreement is unambiguous in this
regard and that it is ambiguous; under the latter position, he further argues that we
may consider the parties' pre-Agreement correspondence.

 In construing a written contract, the primary concern is to ascertain and to give
effect to the parties' intentions as expressed in the document. Frost Nat'l Bank v. L
& F Distribs., Ltd., 165 S.W.3d 310, 311-12 (Tex. 2005). We consider the entire
writing and attempt to harmonize and to give effect to all of the contract's provisions. 
Id. at 312. We construe contracts "'from a utilitarian standpoint bearing in mind the
particular business activity sought to be served'" and "'will avoid when possible and
proper a construction which is unreasonable, inequitable, and oppressive.'" Id.
(quoting Reilly v. Rangers Mgmt., Inc., 727 S.W.2d 527, 530 (Tex. 1987)). "The
language in a contract is to be given its plain grammatical meaning unless doing so
would defeat the parties' intent." Amtech Elevator Servs. Co. v. CSFB 1998-P1
Buffalo Speedway Office Ltd. P'ship, 248 S.W.3d 373, 379 (Tex. App.--Houston [1st
Dist.] 2007, no pet.). 

 If, after the pertinent rules of construction are applied, the contract can be given
a definite or certain legal meaning, it is unambiguous, and we construe it as a matter
of law. Frost Nat'l Bank, 165 S.W.3d at 312. However, if after such rules are
applied, the meaning of the contract remains uncertain or is susceptible to more than
one reasonable interpretation, it is ambiguous. Nat'l Union Fire Ins. Co. v. CBI
Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995); Coker v. Coker, 650 S.W.2d 391,
393-94 (Tex. 1983). If a contract is ambiguous, the contract's interpretation becomes
a fact issue to be resolved by deciding the parties' true intent, for which the fact
finder may consider extraneous evidence of intent. See Nat'l Union Fire Ins. Co.,
907 S.W.2d at 520; Coker, 650 S.W.2d at 394-95. Whether a contract is ambiguous
is a question of law to be determined "by looking at the contract as a whole in light
of the circumstances present when the contract was entered." Coker, 650 S.W.2d at
394.

 The Agreement does not define the term "gross sales price received." We give
the words in this term their plain, ordinary, and generally accepted meaning because
nothing in the Agreement evidences a contrary intent. See Stahl Petroleum Co. v.
Phillips Petroleum Co., 550 S.W.2d 360, 366 (Tex. Civ. App.--Amarillo 1977)
(interpreting contractual term "weighted average price received" in same way for
same reason, when term was left undefined in contract), aff'd, 569 S.W.2d 480 (Tex.
1978). "[T]he phrase 'price received' . . . consists of two terms of ordinary meaning. 
In the more common sense, . . . the term 'price' means the amount of money received
in exchange for anything, and the transitive verb 'received' means to take as
something paid or to accept payment." Id. Under this definition, the phrase "gross
sales price received" unambiguously means the money that Charles and Texas
Staffing actually received for the sale ($700,000), not the full contracted-for price,
most of which went unpaid. See Stahl Petroleum Co., 550 S.W.2d at 366; see also
Life Ins. Co. v. Verex Assurance, Inc., 810 S.W.2d 416, 418 (Tex. App.--Dallas
1991, no writ) (concluding, in context of mortgage insurance policy, that "sales price"
meant cash received by seller upon transfer of property to buyer). (5) Because the term
is unambiguous, we may not resort to extrinsic evidence--such as the June 11, 1998
pre-Agreement letter on which Garry relies--to alter its meaning. See Stahl
Petroleum Co., 550 S.W.2d at 367-68 (applying plain meaning of contractual term,
despite evidence that parties' course of performance indicated that parties intended
different meaning, when term was unambiguous).

 We overrule this challenge under Garry's sole issue.

 b. Failure to Pay Garry Compensation for Former-Worldwide
Accounts That Were Transferred to F.W. Services Before the
Sale to SES


 Garry also sued Charles and Texas Staffing for breach of the Agreement based
on the transfer of Texas Staffing's skilled-labor accounts to F.W. Services before the
sale to SES, for which Garry received no payment. The Agreement provided:

 CHARLES JOEKEL agrees to buy and GARRY PLOTKIN
agrees to sell the book of business of WORLDWIDE SERVICES . . .


 1. JOEKEL/Trendsetter will take control of the Worldwide book of
business on June 29, 1998. Each week thereafter, JOEKEL will
pay PLOTKIN an amount equal to 1½% of the gross sales of the
accounts formerly serviced by Worldwide per a list of accounts
to be agreed upon between the parties. . . .


 2. In the event that JOEKEL sells Trendsetter during the term of this
agreement . . . , this agreement will be terminated. JOEKEL will
pay PLOTKIN at that time the lesser of:


 (1) TWO MILLION FIVE HUNDRED THOUSAND AND
NO/100 DOLLARS ($2,500,000.00) less any amounts
previously paid or


 (2) Twenty-five percent (25%) of the gross sales price received
for Trendsetter less any amounts previously paid to
GARRY PLOTKIN.


(Emphasis added.) 

 In support of this breach-of-express-contract claim, Garry pleaded that Charles
and Texas Staffing

 first sold and/or conveyed the book of accounts from Trendsetter's
skilled labor division [Trendsetter Skilled, a d/b/a of Texas Staffing] to
[Charles's] son, and thereafter sold the remainder of the business to SES
for $3,000,000. . . . [T]he "skilled" labor accounts were first sold to
Kenneth Joekel, with the remaining "staff" leasing labor accounts being
sold to SES. Defendants owe the Plaintiff . . . twenty-five percent of the
value of the assets sold and/or conveyed by Charles Joekel to Kenneth
Joekel. Thus far, the only funds paid to the Plaintiff out of the two sales
was $175,000.


Implicit in this allegation is the understanding that (1) Worldwide sold both skilled-labor and staff-leasing accounts under the Agreement and (2) the Agreement called
for Garry to be paid when Texas Staffing sold any former Worldwide account (staff-leasing or skilled-labor).

 Charles and Texas Staffing moved for traditional and no-evidence summary
judgment on this claim on the following grounds:


 the Agreement's use of the term "Trendsetter" meant Texas
Staffing d/b/a "Trendsetter Staffing," not Texas Staffing d/b/a
"Trendsetter Skilled," as was shown by the contemporaneously
executed Bill of Sale's reference to "Trendsetter Staffing";


 accordingly, the Agreement's requirement that Garry be paid 25%
of the gross sales price received for "Trendsetter" meant that he
be paid only for the sale of the Texas Staffing d/b/a Trendsetter
Staffing, which held only staff-leasing accounts; 


 the accounts held by Texas Staffing d/b/a Trendsetter Staffing
(the only d/b/a holding former Worldwide accounts) were sold to
SES, and the accounts held by Texas Staffing d/b/a Trendsetter
Skilled (with skilled-labor accounts that were not bought from
Worldwide) were sold or transferred to Kenneth;


 accordingly, Garry was entitled to 25% of the sales price received
from SES, which he was paid. 


 Because of the above, Garry could show neither breach nor
damages. (6)


 In support, Charles and Texas Staffing produced and cited Chad Plotkin's
deposition testimony, in which he testified that the accounts bought from Worldwide
were recorded separately from other accounts in the Pay Plus database of
"Trendsetter" (without further specification as to Trendsetter Staffing or Trendsetter
Leasing), so as to track commissions owed to Garry. Chad's deposition testimony
was also cited in support of the summary-judgment ground that all of the former
Worldwide accounts that Texas Staffing d/b/a Trendsetter Staffing bought under the
Agreement were sold to SES, but that testimony did not support that contention. 
Likewise, Charles and Texas Staffing produced the 2001 asset purchase and sales
agreement between SES and "Charles Joekel (the 'Company')," but the copy of that
agreement does not list the assets sold.

 Garry argues that a fact issue exists as to whether some of the accounts that
Worldwide sold under the Agreement ended up in F.W. Services without
compensation to him. We agree. The crux of the summary-judgment motion was that
(1) all accounts that Worldwide sold under the Agreement ended up in Texas Staffing
d/b/a Trendsetter Staffing; (2) no former Worldwide accounts ended up being
transferred to F.W. Services; and (3) SES bought all accounts held in Texas Staffing
d/b/a Trendsetter Staffing, including all of the former Worldwide accounts. As noted
above, the summary-judgment evidence on which Charles and Texas Staffing relied
to show (2) and (3) did not do so. Additionally, in his summary-judgment response,
Garry provided the following evidence:

 Worldwide Temporary Services, a corporation that Garry
eventually "roll[ed] up . . . into Westbury [Worldwide Services,
Inc.]," got into the skilled personnel business "sometime before
[Garry] purchased it," which accounts Garry purchased.


 Garry's business at the time of the Agreement's execution was
"the staff leasing business and skilled personnel business." 
(Emphasis added.)


 The Worldwide accounts sold under the Agreement were carried
in "Trendsetter's" Pay Plus accounting program.


 The skilled-labor accounts were transferred to F.W. Services
before the SES sale.


 Some of the same client names appeared both in a list of accounts
receivable of the d/b/a's of F.W. Services from 1998 to 2001 and
in the lists of accounts that Garry identified by deposition as
having been sold by Worldwide under the Agreement.


Viewed in the required light, this evidence raises a fact issue as to whether (1)
Worldwide sold skilled-labor accounts under the Agreement and (2) some of
Worldwide's former accounts sold under the Agreement--skilled or otherwise--were
transferred to F.W. Services, without payment to Garry, before the sale to SES. This
is some evidence, then, of both breach and damages.

 Garry also disputes the summary-judgment ground that the Agreement's
provisions referring to "Trendsetter"--e.g., "Joekel/Trendsetter will take control of
the Worldwide book of business" and "25% of the gross sales price received for [the
sale of] Trendsetter" (emphasis added)--could have meant only Texas Staffing d/b/a
Trendsetter Staffing. (7) Charles and Texas Staffing respond that the Agreement must
be read with the Bill of Sale, which specified Texas Staffing d/b/a Trendsetter
Staffing as the purchaser. 

 The Agreement used "Trendsetter" without specifying "Trendsetter Staffing"
or "Trendsetter Skilled." Each of these was a d/b/a of a single corporation, Texas
Staffing. A d/b/a ("doing business as") is not a separate corporate entity: rather, it is
a name under which the corporation functions. See Matice Enterps., Inc. v. Gibson,
No. 01-04-00913-CV, 2005 WL 1838018, at *5 (Tex. App.--Houston [1st Dist.]
Aug. 4, 2005, no pet.) (mem. op.). Given this, the actual party to the Agreement was
Texas Staffing. Both of Texas Staffing's d/b/a's used the term
"Trendsetter"--meaning that the Agreement's plain language did not show that
"Trendsetter" meant only Texas Staffing d/b/a Trendsetter Staffing. The Bill of Sale
identifies Texas Staffing by its d/b/a Trendsetter Staffing, but again, the real party
was Texas Staffing. Moreover, and importantly, the two contracts sold different
things: the Bill of Sale sold physical assets and goodwill (i.e., physical or intangible
property other than client accounts), whereas the Agreement sold the book of
business (i.e., client accounts that, in theory, could have encompassed skilled-labor
or staff-leasing accounts). Because the contractual term "book of business" could
theoretically have included either type of client account, (8) and because the movants
asserted that Texas Staffing d/b/a Trendsetter Staffing managed only staff-leasing
accounts, it is reasonable to view the Agreement's term "Trendsetter" as meaning
more than simply d/b/a Trendsetter Staffing, despite the Bill of Sale's more limited
designation. Accordingly, "Trendsetter" did not have to mean the same thing in the
Agreement as it meant in the Bill of Sale. 

 We hold that Garry's evidence raised a genuine issue of material fact that
precluded summary judgment on his breach-of-express-contract claim for
remuneration for the pre-SES-sale transfer of former Worldwide accounts to F.W.
Services. We sustain this challenge under Garry's sole issue.

C. Garry's Standing to Sue on Any Claim and Charles's and Kenneth's
Individual Liability on All Claims


 In both the traditional and no-evidence portions of the defendants' summary-judgment motion, Charles and Kenneth urged that Garry lacked contractual privity,
and thus standing, because Garry was not a party to the Agreement in his individual
capacity and all of his claims arose out of the Agreement. In the traditional portion
of the defendants' summary-judgment motion, Charles argued that the corporate veil
protected him from individual liability on any claim because he signed the Agreement
in his corporate capacity, not individually. Also in the traditional portion of the
defendants' summary-judgment motion, Kenneth argued that the corporate veil
protected him from all of Garry's claims because those claims related entirely to F.W.
Services's actions. Finally, in the no-evidence portion of the defendants' summary-judgment motion, both Charles and Kenneth argued that no evidence raised a fact
issue that they undertook the complained-of actions in their individual capacities.

 1. Garry's Standing

 Worldwide's accounts were corporate assets, not Garry's personal property. 
Cf. Bilodeau v. Webb, 170 S.W.3d 904, 912 (Tex. App.--Corpus Christi 2005, pet.
denied) ("[A] cause of action for injury to the property of a corporation, or the
impairment or destruction of its business, is vested in the corporation, as
distinguished from its stockholders, even though it may result indirectly in the loss
of earnings to the stockholders."). The Agreement implicitly recognizes this by
acknowledging that the sale is "by [Worldwide] of its book of business . . . ." 
Accordingly, when the Agreement recited that "GARRY PLOTKIN agrees to sell the
book of business" of Worldwide, it was surely referring to him in the capacity of a
corporate representative. 

 But this was not the only covenant in the Agreement in which Garry's name
was used. Rather, there were two others. First, the Agreement provided that
"GARRY PLOTKIN" or "PLOTKIN" would be paid either weekly commissions or,
if "Trendsetter" was later sold during the Agreement's term, the lesser of a percentage
of that sale or a fixed sum, less any commissions already paid. Second, the
Agreement provided that "PLOTKIN" would assist after the sale when called upon
in the maintenance of the sold accounts. The parties used Garry's name in these two
covenants, not "Worldwide" or "Garry, on behalf of Worldwide." 

 The use of Garry's name in these two additional covenants renders unclear
whether he held their rights and duties as an individual or as a corporate agent. For
example, in the post-sale landscape in which these covenants came into play,
Worldwide had already sold all of its assets to Texas Staffing and was no longer
operating. Accordingly, the covenant that "PLOTKIN" would assist post-sale as
requested could reasonably be interpreted to mean that Garry individually would
assist. Likewise, it would not be unreasonable to read the covenant to pay "Garry
Plotkin" commissions or a percentage of a later sale to mean payment to Garry
individually: either as the sole director and officer of Worldwide or as its sole
shareholder, (9) Garry could contract to have commissions or a percentage of any later
sale paid to himself individually--regardless of any legal consequences that might
result. And it was the 25%-sale-price covenant upon which Garry based his breach-of-contract claims.

 Furthermore, the Agreement's introductory paragraph provided that "[t]he
following represents our agreement regarding the sale by [Worldwide] of its book of
sales to CHARLES L. JOEKEL." (Emphasis added.) The use of "our agreement" for
the parties, in juxtaposition with the use of "its book of business" for the thing being
sold, render unclear exactly who constituted "our" and for what covenants: Garry
individually, Garry as corporate representative, Charles individually, or Charles as
corporate representative. Finally, the signature blocks did not indicate if the parties
signed individually, as corporate representatives, or in both capacities. 

 Charles and Texas Staffing point to the Bill of Sale--which Charles and Garry
signed as corporate representatives and which was clearly between their two
corporations--to eliminate any ambiguity in the Agreement. But the Bill of Sale
concerned a one-time sale of totally different assets, with no continuing covenants. 
In contrast, the Agreement contained two covenants that the parties intended to
extend beyond the sale date during a time in which Worldwide no longer functioned. 
Although "all writings that pertain to the same transaction will be considered
together, even if they were executed at different times and do not expressly refer to
one another," the Texas Supreme Court has "cautioned . . . that this rule is simply a
device for ascertaining and giving effect to the intention of the parties and cannot be
applied arbitrarily." DeWitt County Elec. Coop., Inc. v. Parks, 1 S.W.3d 96, 102
(Tex. 1999). We thus do not blindly apply the rule when, as here, the two contracts'
provisions differ in material respects. See id.

 We hold that the Agreement is ambiguous as to whether the referenced rights
and obligations were given to Garry in his individual or his corporate capacity. (10) 
Accordingly, the trial court erred in rendering summary judgment on the ground that
Garry lacked standing or privity. See Coker, 650 S.W.2d at 394 ("When a contract
contains an ambiguity, the granting of a motion for summary judgment is improper
because the interpretation of the instrument becomes a fact issue."). We sustain this
challenge under Garry's sole issue.

 2. Charles's Individual Liability

 The sole summary-judgment grounds attacking Garry's ability to sue Charles
individually were that (1) Charles was not a party to the Agreement in his individual
capacity, but only as representative for Texas Staffing; (2) Garry could produce "no
evidence of at least one element required to pierce the corporate veil"; and (3) all of
Garry's claims arose out of the Agreement. 

 We hold that the Agreement is ambiguous as to whether Charles signed the
Agreement in his individual capacity, his corporate capacity, or both, depending on
the obligation. For example, the Agreement provided that "CHARLES L. JOEKEL"
would buy the book of business; that "JOEKEL" would pay "PLOTKIN"
commissions; and that if "JOEKEL" sold "Trendsetter" during the Agreement's term,
"JOEKEL" would pay either a percentage of the sale or a fixed sum, less previously
paid commissions. In contrast, the Agreement elsewhere provided that
"JOEKEL/Trendsetter" would take control of the book of business and that
"PLOTKIN" would assist "JOEKEL/Trendsetter" as they requested with the
maintenance of former Worldwide accounts. Again, the signature blocks did not
indicate if the parties signed individually, as corporate representatives, or in both
capacities. And as we discussed above in the context of Garry's standing, the Bill of
Sale's language does not render the meaning of "JOEKEL," "CHARLES L.
JOEKEL," or "JOEKEL/Trendsetter" unambiguous.

 For these reasons, we hold that the Agreement is ambiguous as to whether
Charles was signing as Texas Staffing's representative or individually. Because of
this, it is irrelevant whether Garry produced some evidence to pierce Texas Staffing's
corporate veil. Accordingly, the trial court erred in rendering summary judgment on
the ground that Charles could not be sued in his individual capacity. See Coker, 650
S.W.2d at 394. We sustain this challenge under Garry's sole issue.

 3. Kenneth's Individual Liability

 Kenneth's summary-judgment motion asserted that, because all of Garry's
claims related to the acts of his corporation, F.W. Services, Kenneth could not be held
individually liable; the no-evidence portion of his motion asserted that Garry could
produce no evidence entitling him to pierce the corporate veil. The argument in
Garry's relevant appellate briefing concerns only Charles and the capacity in which
Garry and Charles signed the Agreement. Kenneth was not a party to the Agreement. 
Garry does not discuss Kenneth's individual liability, and we can discern no attack
of Kenneth's summary-judgment ground that he could not be individually liable. 
Accordingly, we affirm the summary judgment rendered on all of Garry's claims
alleged against Kenneth in his individual capacity. See Tricon, 226 S.W.3d at 500.

D. Implied-In-Fact and Quasi Contract Claims Against F.W. Services (11)

 Garry's pleading did not employ the term "implied-in-fact contract," but he
now takes the position that he pleaded such a claim. Garry expressly pleaded that an
"implied contract in law," i.e., a quasi contract, arose between him and F.W. Services
because the latter knew that the accounts that Charles transferred to it contained
former Worldwide accounts, resulting in a fraudulent conveyance that unjustly
enriched F.W. Services. 

 1. Implied-in-Fact Contract

 Garry first argues that the trial court erred in rendering summary judgment on
his implied-in-fact breach-of-contract claim. 

 "The elements of a contract, express or implied, are identical." Univ. Nat'l
Bank v. Ernst & Whinney, 773 S.W.2d 707, 710 (Tex. App.--San Antonio 1989, no
writ). Accordingly, the elements of either type of contract are "(1) an offer, (2) an
acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, and (5)
execution and delivery of the contract with the intent that it be mutual and binding." 
DeClaire v. G & B Mcintosh Family Ltd. P'Ship, 260 S.W.3d 34, 44 (Tex.
App.--Houston [1st Dist.] 2008, no pet.). "[T]he real difference between express
contracts and those implied in fact is in the character and manner of proof required
to establish them." Haws & Garrett Gen. Contractors., Inc. v. Gorbett Bros. Welding
Co., 480 S.W.2d 607, 609 (Tex. 1972). "In each instance there must be shown the
element of mutual agreement which, in the case of an implied contract, is inferred
from the circumstances." Id. 

 Garry's pleading expressly referred only to a "contract implied in law" (i.e., a
quasi contract), not an implied-in-fact one. The supporting allegations were not
entirely clear as to which type of implied contract Garry meant. Rather than specially
excepting for clarification, F.W. Services construed Garry's allegations to include
breach of an implied-in-fact contract and moved for no-evidence summary judgment
on that claim, raising these grounds:

 1. No evidence demonstrated that F.W. Services and Garry had a
meeting of the minds.


 2. No evidence existed that F.W. Services consented to be bound.


 3. No evidence existed that Garry tendered performance or provided
goods and services.


 4. No evidence of privity existed between Garry and F.W. Services
for various reasons.

 Garry's summary-judgment response addressed the fourth summary-judgment
ground--privity--by urging that he was in privity with F.W. Services because it had
"received accounts conveyed by Garry . . . to Charles . . . and did not pay [Garry]
either commissions owed . . . , or the value of the business which was conveyed . . . ,"
so that Garry "was clearly in privity with [F.W. Services] with respect to funds due
and owing [Garry] under the terms of [the Agreement]." He did not address any of
the first three grounds, however, and his response did not point to evidence raising
a fact issue on the challenged elements. (12) A trial court must grant a no-evidence
summary-judgment motion if the non-movant does not produce evidence raising a
fact issue on a challenged element. See Tex. R. Civ. P. 166a(i). Accordingly, we
hold that the trial court did not err in rendering summary judgment on any implied-in-fact breach-of-contract claim that Garry might have alleged. We overrule this
challenge under Garry's sole issue.

 2. Quasi Contract

 In support of his quasi contract claim against Kenneth and F.W. Services,
Garry alleged that these defendants were "beneficiaries of the monies and accounts
conveyed by [Garry] to [Charles and Texas Staffing]"; that they "used those assets for
their own benefit sans any compensation" to Garry; that the claim was also based on
Kenneth's "position in privity with [Charles's] business, as well as [Kenneth's and
F.W. Services's] knowledge of the terms reflected in the [Agreement] prior to the
fraudulent transfer of [Garry's] accounts from Charles . . . to Kenneth"; and that
Garry sought "damages he sustained" (13) from the "fraudulent conveyance" of "funds
and accounts had and received" by Kenneth and F.W. Services. 

 "'Contracts implied in law, or . . . more properly quasi or constructive
contracts, are a class of obligations which are imposed or created by law without
regard to the assent of the party bound, on the ground that they are dictated by reason
and justice . . . ." Ferrous Prod. Co. v. Gulf States Trading Co., 160 Tex. 399,
402-03, 332 S.W.2d 310, 312 (1960) (quoting Arthur L. Corbin, Corbin on
Contracts and C.J.S., Contracts). "'Such contracts rest on the equitable principle
that a person shall not be allowed to enrich himself unjustly at the expense of another,
and on the principle that whatsoever it is certain that a man ought to do, that the law
supposes him to have promised to do. . . .'" Id. F.W. Services's no-evidence
summary-judgment motion asserted that Garry "failed to present any admissible
evidence that a contract implied in law [i.e., a quasi contract] was created." 

 Garry's petition alleged that the equity to be served by restitution damages was
remedying the fraudulent conveyance of former Worldwide accounts to Kenneth with
Kenneth's knowledge. That is, Garry alleged that Kenneth's and F.W. Services's
wrongful conduct underlay this claim. However, in seeking to substantiate this
allegations, Garry pointed only to the Agreement and the list of accounts receivable
of the d/b/a's of F.W. Services, which contained some of the accounts that Garry
identified as former Worldwide accounts. Garry did not identify any evidence in
support of this quasi contract claim that anything akin to a fraudulent transfer to
Kenneth had occurred with Kenneth's knowledge or that Kenneth had otherwise
intentionally taken advantage of him--which was the basis that Garry had alleged
justified the imposition of a quasi contract. (14) 

 Given the state of Garry's allegations and evidence tendered in support, we
hold that the trial court did not err in rendering summary judgment on that claim. We
overrule this challenge under Garry's sole issue.

E. Breach of Fiduciary Duty

 Garry pleaded a breach-of-fiduciary-duty claim against Charles and Texas
Staffing, referencing Garry and Charles's verbal agreement to hold Garry's
commissions "in trust," which "Charles Joekel converted . . . for his own use and
benefit without [Garry's] knowledge and consent." 

 The elements of a breach-of-fiduciary-duty claim are (1) the existence of a
fiduciary relationship between the plaintiff and defendant; (2) the defendant's breach
of the fiduciary duties arising from that relationship; and (3) injury to the plaintiff, or
benefit to the defendant, resulting from that breach. Jones v. Blume, 196 S.W.3d 440,
447 (Tex. App.--Dallas 2006, pet. denied). The no-evidence portion of Charles and
Texas Staffing's summary-judgment motion attacked all elements of the claim.

 Garry's claim rested not on a formal fiduciary relationship, but on an informal
one. "An informal fiduciary duty may arise from a moral, social, domestic or purely
personal relationship of trust and confidence, generally called a confidential
relationship." Assoc. Indem. Corp. v. CAT Contracting, Inc., 964 S.W.2d 276, 287
(Tex. 1998). This duty is not lightly created, however. Id. at 288. "To impose an
informal fiduciary duty in a business transaction, the special relationship of trust and
confidence must exist prior to, and apart from, the agreement made the basis of the
suit." Id. "[M]ere subjective trust does not . . . transform arm's-length dealing into
fiduciary relationship." Schlumberger Tech. Corp. v. Swanson, 959 S.W.2d 171, 177
(Tex. 1997). "Although . . . the existence of a confidential relationship is ordinarily
a question of fact, when the issue is one of no evidence, it becomes a question of
law." Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp., 823 S.W.2d 591,
594 (Tex. 1992).

 The only basis that Garry asserted for a fiduciary duty was the oral agreement
to hold his commissions in trust. (15) The commissions were part of an arms-length,
express contract between Garry and Charles or Texas Staffing. This agreement is
simply not the type that will give rise to a fiduciary duty. Garry relied below on no
evidence of a fiduciary relationship that existed prior to or apart from the verbal
agreement to hold commissions. See id. The trial court thus did not err in rendering
summary judgment on Garry's breach-of-fiduciary-duty claim.

 We overrule this challenge under Garry's sole issue.

Charles and Texas Staffing's and Kenneth and F.W. Services's Appeals



A. Bases for Judgment Not Challenged on Appeal


 Charles and Texas Staffing counterclaimed against Garry for breach of the
Agreement's requirement that he assist after the sale in the maintenance of the former
Worldwide accounts upon request. Garry moved for no-evidence summary judgment
on this claim. Charles and Texas Staffing do not challenge the summary-judgment
rendered on this claim. Accordingly, we must affirm that portion of the judgment. 
See Tricon Tool & Supply, Inc., 226 S.W.3d at 500.

 Garry, Chad, and Chad's three corporations also moved for no-evidence
summary judgment on the claim for attorney's fees of Kenneth and F.W. Services. 
Kenneth and F.W. Services did not respond to that ground below, and they do not
challenge on appeal the rendition of judgment on their fee request. Accordingly, we
must affirm this portion of the summary judgment, as well. See id.


 Finally, Kenneth and F.W. Services do not complain on appeal of the rendition
of summary judgment on their claims that Garry, Chad, and Chad's three corporations
tortiously interfered with (1) an agreed temporary injunction between Cary and F.W.
Services and (2) unspecified "existing labor staffing contracts in the San Antonio and
Houston markets" other than their non-competition agreement with Cary. 
Accordingly, we must also affirm the judgment rendered on these tortious
interference claims. See id.

B. Charles and Texas Staffings's Fraud Counterclaims Against Garry

 In issue five, Charles and Texas Staffing contend that the trial court erred in
rendering summary judgment on their fraud counterclaims against Garry. See Sears,
Roebuck & Co. v. Meadows, 877 S.W.2d 281, 282 (Tex. 1994) ("'The elements of
fraud are a material misrepresentation, which was false, and which was either known
to be false when made or was asserted without knowledge of its truth, which was
intended to be acted upon, which was relied upon, and which caused injury.'" )
(quoting DeSantis v. Wackenhut Corp., 793 S.W.2d 670, 688 (Tex. 1990)).

 In their counter-petition, Charles and Texas Staffing alleged that Garry had
committed fraud by (1) misrepresenting that Worldwide's book of business was worth
$30 million per year and (2) misrepresenting that he would continue to assist in the
maintenance of the former Worldwide accounts upon request. Garry moved for no-evidence summary judgment on each element of these fraud claims. In their
summary-judgment response, Charles and Texas Staffing did not identify any
evidence to show the falsity of Garry's representations concerning the value of
Worldwide's accounts or of his agreement to assist with these accounts' maintenance
in future--the sole factual bases for their claims. Rather, their response focused
solely on Garry's alleged forgery, following the Agreement's execution, of an
"Exhibit A" to the Agreement, in which Garry listed former Worldwide accounts on
which the parties had purportedly agreed that he would receive commissions. Charles
and Texas Staffing's appellate challenges also focus on Exhibit A.

 Charles and Texas Staffing's summary-judgment evidence was not relevant to
the fraud allegations set forth in their pleadings and on which Garry moved for
summary judgment. Accordingly, the trial court did not err in rendering summary
judgment on Charles and Texas Staffing's fraud claims against Garry.

 When Charles and Texas Staffing raised a new basis for their fraud claim in
their summary-judgment response, Garry did not object, but neither did he join the
issue by reply. Even if the new fraud allegation could be viewed as having been tried
by consent, (16) Charles and Texas Staffing did not point out evidence concerning the
fraud elements of reliance and damages arising from the alleged fabrication of Exhibit
A. See Meadows, 877 S.W.2d at 282. A trial court must grant a no-evidence
summary judgment on a claim if the non-movant does not produce any evidence of
the challenged elements of that claim. See Tex. R. Civ. P. 166a(i).

 We overrule issue five.

C. Kenneth and F.W. Services's Fraud Counterclaim Against Garry

 In issue four, Kenneth and F.W. Services contend that the trial court erred in
granting Garry's no-evidence summary-judgment motion on their fraud counterclaim
against Garry.

 Kenneth and F.W. Services alleged that Garry

 made false, material representations to [them] regarding his loyalty and
ability to maintain the confidentiality of all records, plans and
information he acquired through his relationship with [them]. [Garry]
falsely represented to [them] that as confidant and close business
associate, he would not do anything detrimental to the business success
of [them]. [Garry] further falsely represented that he did not have any
continuing relationship with Diamond, Cary or Murphy after they left
their employment with F.W. Services, Inc.


 Garry's no-evidence summary-judgment motion challenged all elements of this
fraud counterclaim.

 Although Kenneth and F.W. Services' summary-judgment response alleged
that Garry had made representations that he was reliable and would not use F.W.
Service's confidential financial information, they pointed to no summary-judgment
evidence to support this allegation. For example, their response to the motion's
attack on the fraud counterclaim pointed to only two pieces of evidence: (1) some of
CJP Financial's corporate records from the Texas Secretary of State and (2)
Diamond's deposition, which contained no testimony about the alleged
representations. Because Kenneth and F.W. Services failed to carry their burden of
producing some evidence to support this element of their fraud counterclaim against
Garry, we hold that the trial court did not err in rendering summary judgment on it. 
See Tex. R. Civ. P. 166a(i); Meadows, 877 S.W.2d at 282. 

 We overrule issue four.

D. Charles and Texas Staffing's and Kenneth and F.W. Services's
Counterclaims Against Garry for Breach of Fiduciary Duty

 In issue six, Charles and Texas Staffing argue that the trial court erred in
granting Garry's no-evidence summary-judgment motion on their counterclaim for
breach of fiduciary duty against Garry. In issue three, Kenneth and F.W. Services
argue that the trial court erred in granting Garry's no-evidence summary-judgment
motion on their counterclaim for breach of fiduciary duty against Garry.

 1. The Allegations

 Kenneth and F.W. Services alleged that Garry had a "special relationship of
trust and confidence" with them, which he had breached by "conspiring to establish
competing businesses," and which had damaged them in unspecified ways. Charles
and Texas Staffing alleged that Garry's breach of his fiduciary relationship to them
had resulted in damages, which included his owing them for 10 years of rent, utilities,
and other operating expenses. Charles and Texas Staffing further alleged that Charles
"conveyed and required [what became Worldwide's] business with the express and
implied understanding that [Garry] would continue to honor his commitments to
[Charles] of good faith and fair dealing." The relevant underlying facts that both
petitions alleged were that (1) Garry ran Worldwide from their offices without paying
overhead or expenses; (2) Garry had unlimited access to their business plans, trade
secrets, files, business records, contracts, and computers; (3) he worked in close
proximity to their employees; and (4) they trusted him.

 2. The Law

 Again, the elements of a breach-of-fiduciary-duty claim are (1) the existence
of a fiduciary relationship between the plaintiff and defendant; (2) the defendant's
breach of the fiduciary duties arising from that relationship; and (3) injury to the
plaintiff, or benefit to the defendant, resulting from that breach. Jones, 196 S.W.3d
at 447. "To impose an informal fiduciary duty in a business transaction, the special
relationship of trust and confidence must exist prior to, and apart from, the agreement
made the basis of the suit," and mere subjective trust is not enough. Assoc. Indem.
Corp., 964 S.W.2d at 288; Swanson, 959 S.W.2d at 177.

 3. The Motions and Responsive Evidence

 Garry's no-evidence summary-judgment motion challenged each element of
Charles and Texas Staffings's and Kenneth and F.W. Services's breach-of-fiduciary-duty counterclaims against him. We need to consider only the element of the
existence of a fiduciary relationship.

 It was undisputed that Garry was not F.W. Services's employee or
representative and that he had his own staffing business during the time that he shared
offices with F.W. Services. In their respective responses, Charles, Texas Staffing,
Kenneth, and F.W. Services argued that a fiduciary relationship arose from Charles'
long-term friendship with Garry, Charles' and Kenneth's having allowed Garry to
share F.W. Services's office for eight years, their having given Garry complete access
to F.W. Services's business records, and their trust and reliance on him. By reply
brief, however, they expressly disavow reliance on the parties' long-time friendship
and their sharing of office space, arguing instead that the fiduciary relationship arose
by virtue of their having "entrusted Garry with confidential information." Looking
only to this basis, we consider the evidence that Charles, Texas Staffing, Kenneth,
and F.W. Services tendered below in support:




 While Garry shared offices with them, he had "complete access
to [Kenneth's] entire business," including "staff, records,
everything."


 "We trusted [Garry] 100 percent," believing that he "was
essentially a family member . . . ."


 "When F.W. Services was preparing to relocate [to a new
location], Garry . . . offered to personally take responsibility for
transporting F.W. Services's corporate records," an offer that
Charles and Kenneth accepted because they "trusted him as
though he were part of the family."

 An informal fiduciary duty is not lightly recognized. See Assoc. Indem. Corp.,
964 S.W.2d at 288. The record shows that Garry, Charles, and Kenneth were
experienced business people, that each had his own business, and that none was a co-employee or representative of any common business. Their mere access to each
others' business records and information while office-sharing does not convert their
standard business relationship into one of the highest fiduciary stature, in which each
party would have to place the other's interests before his own. This is especially true
here, where each party independently operated a separate staff-leasing or payrolling
business during the period of office-sharing. We have found no authority recognizing
an informal fiduciary relationship on evidence like this, and Charles, Kenneth, and
their businesses point us to none. Finally, the above evidence, which appellants
concede is the sole basis for the relationship underlying this claim, shows Garry's
access to F.W. Services's business records; it does not show that Garry had access to
Texas Staffing's business records, and it is no evidence of a fiduciary relationship
between Garry, on the one hand, and Charles and Kenneth individually, on the other.

 On appeal, Charles, Texas Staffing, Kenneth, and F.W. Services also argue that
they raised a fact issue on an alternative breach-of-fiduciary-duty theory: that Garry
was liable for inducing Cary to breach Cary's fiduciary duty to F.W. Services. This
theory was not pleaded as a basis for any defendant's breach-of-fiduciary-duty claim
against Garry, however. Kenneth and F.W. Services did raise this theory in one
sentence of their summary-judgment response. But even if their doing so could
somehow render the theory tried by consent, when Garry did not join the issue by
reply, (17) we would overrule the challenge. Kenneth and F.W. Services pointed to no
evidence in support of that theory below, including anything showing that any
fiduciary duty that Cary owed to F.W. Services during his employment with it
extended beyond his employment term, which is the point at which he allegedly
began competing in violation of his non-competition agreement. See Tex. R. Civ.
P. 166a(i). 


 We hold that the trial court properly rendered summary judgment on the
breach-of-fiduciary-duty claims of Charles, Texas Staffing, Kenneth, and F.W.
Services against Garry. We overrule issues three and six.

F. Kenneth and F.W. Services's Counterclaims Against Garry, and Their
Third-Party Claims Against Chad and Chad's Three Corporations, for
Conspiracy and Tortious Interference With an Existing Contract and
With Prospective Business Relations


 Third-party plaintiffs and counter-defendants Kenneth and F.W. Services
alleged that counter-defendant Garry and third-party defendants Chad, CJP Financial,
CJP Resources, and Your Recruiters had tortiously interfered with F.W. Services's
existing non-competition agreement with Cary and that, through promoting Cary's
competition, they had also tortiously interfered with F.W. Services's prospective
business relations.

 Kenneth and F.W. Services also alleged that Garry, Chad, and Chad's three
corporations had conspired "to destroy [their] business . . . by setting up a factoring
business, in order to aid, assist, and financially support competing businesses"; to
induce F.W. Service's employees to use its confidential information to compete with
it; and to induce Cary to violate his non-competition agreement with F.W. Services. 

 Garry moved for no-evidence summary judgment on these counterclaims. 
Chad and his three corporations moved for traditional and no-evidence summary
judgment on these third-party claims. 

 1. The No-Evidence Summary-Judgment Motions of Garry and of
Chad and His Three Corporations

 a. Tortious interference with existing contract

 In part of issue one, Kenneth and F.W. Services assert that the trial court erred
in granting the no-evidence summary-judgment motions of Garry, Chad, and Chad's
three corporations on their counterclaim and third-party claim for tortious interference
with an existing contract. 

 The elements of tortious interference with an existing contract are that (1) the
plaintiff had a contract subject to interference, (2) the defendant willfully and
intentionally interfered with that contract, (3) the interference proximately caused the
plaintiff's damage, and (4) the plaintiff incurred actual damage or loss. C.M. Asfahl
Agency v. Tensor, Inc., 135 S.W.3d 768, 790 (Tex. App.--Houston [1st Dist.] 2004,
no pet.). The no-evidence summary-judgment motions of Garry and of Chad and his
three corporations challenged each element of this claim. 

 In response, Kenneth and F.W. Services produced the following evidence:

 that after Cary left F.W. Services, Huntington--a company owned
by Garry's brother--serviced 80% to 85% of the factoring needs
for Cary's new staffing business, Opcion Uno, L.L.C., which
operated in San Antonio;


 that Huntington was in place as a funding source before Cary left
F.W. Services;



 that Garry had referred Cary to Huntington for financing and had
assured Cary prior to Cary's leaving F.W. Services that
Huntington could provide him funding;


 that Cary mainly talked to and dealt with Garry about matters
related to Huntington, even though Garry's brother owned the
company;


 that it was important for Cary to have adequate financing to start
his business;


 that before he left F.W. Services in May 2002, Cary spoke with
Garry at least once about the ins and outs of starting his own
business;


 that Cary had a non-competition agreement with F.W. Services,
which precluded his competing with F.W. Services within a 50-mile radius of any city in which the company conducted its
business;


 that Cary told Garry that he had this non-competition agreement
with F.W. Services, that he told Garry about his idea to open a
business in San Antonio so as not to violate that agreement, and
that Cary believed that Garry "thought that [Cary's] thought
process was sound";


 that "Pacesetter Personnel" operated in San Antonio; (18)


 that Cary had been a key employee of F.W. Services; and


 that F.W. Services spent eight months locating and training a
replacement for Cary, who until he had left had been the only
employee trained to train new sales people.

 We first hold that Kenneth and F.W. Services produced some evidence of each
element of this claim against Garry, including evidence showing Garry's knowledge
of the non-competition agreement's existence; his assistance in obtaining, and in
continuing to be a contact for, Huntington's factoring of Cary's San Antonio
business, which was necessary to the running of that business; F.W. Services d/b/a
Pacesetter Personnel's operating in San Antonio to some extent; and F.W. Services's
having had to locate and to train Cary's replacement over an eight-month period,
when Garry had been the only employee trained to train new sales people.

 We also hold, however, that Kenneth and F.W. Services did not carry their
burden of producing some evidence of each element of this claim against Chad or his
three corporations. Kenneth and F.W. Services' brief asserts that "Chad . . . solicited
his father's and Huntington's help in tortiously interfering with the Cary/Pacesetter
employment contact"; that "Chad . . . permitted this arrangement [for Huntington's
factoring of Cary's business] to take place"; and that "even though Chad was aware
of the non-compete provision, he intentionally encouraged Cary to violate his
agreement and assisted him in his endeavor by facilitating discussions between his
father and Cary." But the summary-judgment evidence, even when viewed in the
light most favorable to Kenneth and F.W. Services, shows none of these things. (19) 
Rather, the cited evidence shows only that Chad and Cary had been close friends
since college, that Cary had mentioned to Chad that he was thinking about starting
a business in San Antonio, and that Cary told Chad at some unspecified point that he
was receiving factoring from Huntington, although Chad did not recall Cary's
mentioning that fact to him at the time that Cary was first going into business. No
cited evidence indicates that Chad knew of the non-competition agreement, that Chad
facilitated any discussions between Garry or Huntington and Cary, or that Chad or his
companies encouraged or assisted Cary in violating his non-competition agreement. 
Kenneth and F.W. Services ask us to infer from Chad and Cary's close friendship and
Garry's knowledge of the non-competition agreement that Chad also knew of the
agreement, but that would require crediting speculation as evidence and stacking
inference upon inference, neither of which we may do. See Marathon Corp. v.
Pitzner, 106 S.W.3d 724, 727-28 (Tex. 2003).

 We address one final matter raised by Garry, Chad, and Chad's three
corporations on appeal. They contend that the non-competition agreement was not
part of the summary-judgment evidence because it, along with other evidence, was
struck upon their objections. However, the order granting their objections and
striking the non-competition agreement was signed more than two months after the
trial court had already rendered summary judgment, at the time of the denial of
Garry's simultaneously filed motion for new trial. Although the belated order recited
that the exhibits were struck from Kenneth and F.W. Services's summary-judgment
response, nothing in the final summary judgment itself indicates that the trial court
considered the objections when it ruled on the summary-judgment motion. For
example, the judgment recited that the court had considered "the evidence," without
restriction, and did not mention the evidentiary objections. Additionally, Garry's
motion for new trial, in which he asked for a ruling on his prior objections, noted that
"the Court did not rule upon [Garry's] objections to Defendants' summary judgment
exhibits" and thus requested a "specific written ruling on each objection" for
"purposes of preserving the appellate record" because "failure to get written rulings
waives the objections on appeal . . . , a waiver which Plaintiff declines." (Emphasis
added.) 

 Given this record and these circumstances, it is not entirely clear that the trial
court's signing the order striking this evidence two and a half months after its
summary-judgment ruling, in conjunction with its consideration of a motion for new
trial, demonstrated that the court did not consider the disputed evidence at the time
of its summary-judgment ruling. The ambiguity in this case distinguishes it from
those in which the record more clearly demonstrated that a belated written ruling on
evidentiary objections memorialized an unwritten ruling made at the time of summary
judgment. (20) As with any ruling, a summary-judgment order's review generally
extends to the evidence that was before the court when it ruled, absent an indication
that the court did not consider certain evidence for purposes of that ruling. See 
Methodist Hosps. of Dallas v. Tall, 972 S.W.2d 894, 898 (Tex. App.--Corpus Christi
1998, no pet.) ("It is axiomatic that an appellate court reviews actions of a trial court
based on the materials before the trial court at the time it acted.") Accordingly, we
cannot say with certainty that the trial court did not consider the non-competition
agreement when it rendered summary judgment.

 We sustain the portion of issue one that complains of the judgment rendered
on the claim against Garry for tortious interference with Cary's non-competition
agreement with F.W. Services. We overrule the portion of issue one that complains
of the judgment rendered on the claim against Chad and his three corporations for
tortious interference with Cary's non-competition agreement with F.W. Services.

 b. Tortious interference with prospective business relationships

 In the remainder of issue one, Kenneth and F.W. Services assert that the trial
court erred in granting the no-evidence summary-judgment motions of Garry, Chad,
and Chad's three corporations on their counterclaim and third-party claim for tortious
interference with prospective business relationships. As they did with their claim for
tortious interference with an existing contract, Kenneth and F.W. Services clarify on
appeal that the focus of this claim is on the alleged recruitment of and assistance to
Cary in his starting a competing business in San Antonio.

 "To establish a cause of action for tortious interference with prospective
business relationships, a plaintiff must show that (1) there was a reasonable
probability that the parties would have entered into a business relationship; (2) the
defendant committed an independently tortious or unlawful act that prevented the
relationship from occurring; (3) the defendant either acted with a conscious desire to
prevent the relationship from occurring or knew the interference was certain or
substantially certain to occur as a result of the conduct; and (4) the plaintiff suffered
actual harm or damages as a result of the defendant's interference." 
Richardson-Eagle, Inc. v. William M. Mercer, Inc., 213 S.W.3d 469, 475 (Tex.
App.--Houston [1st Dist.] 2006, pet. denied). The motions of Garry and Chad and
his three corporations challenged each element of this claim.

 The sole evidence that Kenneth and F.W. Services's response pointed out to
show elements (1) and (4) was Kenneth's affidavit, in which he averred that "F.W.
Services suffered further lost profits" from Cary's competing against it because "it
is reasonably likely that some of the unskilled work Cary obtained for his own
business would have been obtained for F.W. Services had Cary remained." This
assertion is conclusory and cannot raise a fact issue on summary judgment. See
Ryland Group, Inc. v. Hood, 924 S.W.2d 120, 122 (Tex. 1996) ("Conclusory
affidavits are not enough to raise fact issues" in that "[t]hey are not credible, nor [are
they] susceptible to being readily controverted"). The conclusory nature of this
evidence distinguishes it from the evidence in Bradford v. Vento, on which Kenneth
and F.W. Services rely: here, there is no evidence as to the type of clients (skilled or
not) F.W. Services serviced in San Antonio, the number of its San Antonio customers,
or like matters that would have shown a reasonable probability that the clients that
Cary serviced there would have contracted with F.W. Services if Cary had not
operated there. Compare id., 997 S.W.2d 713, 732 (Tex. App.--Corpus Christi 1999)
(holding that legally and factually sufficient evidence of first element of tortious-interference-with-prospective-business-relations claim existed when plaintiff, who
alleged that he had lost customers due to defendant's interference, produced evidence
that plaintiff had considerable experience in selling product, a large collection of
merchandise, an established and expanding customer base, and a certain volume of
customer sales), rev'd in part on other grounds, 48 S.W.3d 749 (Tex. 2001). 

 Additionally, as discussed with respect to the third-party claim against Chad
and his corporations for tortious interference with an existing contract, there is no
evidence that Chad or his corporations, which did not provide factoring services to
Cary, tortiously interfered with anything.

 We overrule the remainder of issue one that complains of the judgment
rendered on the claim against Garry, Chad, and Chad's three corporations for tortious
interference with prospective business relations. 

 c. Civil conspiracy

 In issue two, Kenneth and F.W. Services argue that the trial court erred in
granting the no-evidence summary-judgment motions of Garry, Chad, and Chad's
three corporations on their counterclaim and third-party claim for civil conspiracy.

 Kenneth and F.W. Services's petition alleged that Garry, Chad, and Chad's
three corporations had conspired "to destroy [their] business . . . by setting up a
factoring business, in order to aid, assist, and financially support competing
businesses"; to induce F.W. Service's employees to use its confidential information
to compete with it; and to induce Cary to breach his non-competition agreement with
F.W. Services. As they did with their tortious interference claims, Kenneth and F.W.
Services clarify on appeal that their conspiracy claim arises from "the enticement of
. . . Cary to breach his employment agreement and set up a competitive business." 

 The elements of civil conspiracy are (1) two or more people; (2) an object to
be accomplished; (3) a meeting of the minds on the object or course of action; (4) one
or more unlawful, overt acts; and (5) damages as a proximate result. Tri v. J.T.T., 162
S.W.3d 552, 556 (Tex. 2005). The movants challenged all elements of this claim.

 First, for the same reasons as discussed above with regard to the tortious
interference claims, Kenneth and F.W. Services did not raise a fact issue on element
(2) of their conspiracy claim against Chad and his three corporations. In fact, the only
appellate argument concerning the allegations against Chad and his corporations is
a conclusory statement that "Chad and Garry Plotkin entered into a conspiracy to
destroy [Kenneth and F.W. Services] and steal away Pacesetter's top employees" and
an assertion that "Chad, as sole officer and director or CJP Financial, allowed his
father to use his company to perpetuate this conspiracy." The evidence, however,
showed that Huntington, not Chad or his corporations, financed Cary's San Antonio
business, not that Chad "allowed" Garry to do anything related to Cary or that Garry
had used Chad's corporations to service Cary's business. Accordingly, we hold that
the trial court did not err in granting the no-evidence summary-judgment motion on
Kenneth and F.W. Services's conspiracy claim against Chad and his corporations.

 Kenneth and F.W. Services's counter-petition alleged that Garry, Chad, and
Chad's three corporations were the coconspirators. We have already held that
Kenneth and F.W. Services produced no evidence that Chad or his corporations were
part of a conspiracy concerning Cary and his San Antonio business. There cannot be
a conspiracy of one. See Tri, 162 S.W.3d at 556 (providing that civil conspiracy
requires two or more people). Accordingly, we hold that the trial court also properly
rendered summary judgment on Kenneth and F.W. Services's claim of conspiracy
against Garry.

 We overrule issue two.

 2. The Motion for Traditional Summary Judgment of Chad and His
Three Corporations


 Third-party defendants Chad and his three corporations moved for traditional
summary judgment on both of the tortious interference claims and on the civil
conspiracy claim alleged against them on the sole basis that the statute of limitations
barred those claims. In issue seven, Kenneth and F.W. Services contend that the trial
court erred in granting the traditional summary-judgment motion of Chad and his
three corporations on this basis. 

 Because we have already held that the trial court properly rendered no-evidence
summary judgment on Kenneth and F.W. Services's claims against Chad and his three
corporations for tortious interference with an existing contract, tortious interference
with prospective business relations, and civil conspiracy, we need not consider
whether the trial court erred in granting traditional summary judgment on these same
claims. See Aleman, 227 S.W.3d at 309 (holding that when summary-judgment order
does not specify grounds, we affirm if any is meritorious). Accordingly, we do not
reach issue seven.

Conclusion


 We reverse the summary judgment to the extent that it rendered judgment on
the following claims:

 Garry's claim against Charles and Texas Staffing for breach of
the Agreement based on the transfer of certain accounts to
Kenneth or F.W. Services;


 Kenneth's and F.W. Services's counterclaim against Garry for
tortious interference with an existing contract between Cary and
F.W. Services.



The judgment is affirmed in all other respects. The cause is remanded for
proceedings consistent with this opinion.


 Tim Taft (21)

 Justice


Panel consists of Justices Jennings, Bland, and Taft.
1. The record indicates that a payroll-services business--also called an employee-leasing
or staff-leasing business--is a business that assumes a client's employees in order, for
a fee, to administer the client's business payroll, employment-related taxes, worker's
compensation insurance, and other employee benefits. For simplicity's sake, we will
use the term "staff-leasing" business throughout the remainder of the opinion.
2. The record indicates that a skilled-labor business is one providing temporary skilled
labor.
3. The record indicates that factoring is a form of financing, often used in the staff-leasing business, in which a company's accounts receivable serve as collateral for
loans. The factoring company holds the accounts receivable, collects the money owed
on them, and then sends the money to the client company when requested.
4. See Tex. Bus. & Com. Code Ann. §§ 24.001-.013 (Vernon 2009).
5. Garry contends that the term is ambiguous because (1) he reads it to mean "gross sales
price to be received by the seller under the sales contract" (emphasis added) and (2)
the parties' differing interpretations of the same term mean that it is ambiguous. First,
Garry's interpretation depends on the insertion of words into the phrase, not on the
phrase's actual wording. Second, an ambiguity does not arise merely because the
parties to the agreement have different interpretations of a term. DeWitt County Elec.
Co-op., Inc. v. Parks, 1 S.W.3d 96, 100 (Tex. 1999).
6. Charles and Texas Staffing also argued that Garry could produce no evidence of
privity between himself and them. We discuss this summary-judgment basis further
below.
7. Garry did not raise this argument in his summary-judgment response, but he may raise
it now because it concerns whether Charles and Texas Staffing's summary-judgment
motion satisfied its burden on this ground. See City of Houston v. Clear Creek Basin
Auth., 589 S.W.2d 671, 678 (Tex. 1979).
8. This possibility is borne out by the parties' competing summary-judgment evidence:
Garry's evidence showed that Worldwide's book of business included both staff-leasing and skilled-labor accounts; other evidence indicated that Worldwide had only
staff-leasing accounts to sell. For the reasons discussed earlier, we of course must
take as true Garry's evidence that Worldwide transferred both kinds of accounts under
the Agreement. For purposes of the current discussion, however, we note merely that
the term "book of business" was not limited to a particular type of account.
9. See Speedy Stop Food Stores, Ltd. v. Reid Rd. Mun. Util. Dist. No. 2, 282 S.W.3d 652,
656 n.2 (Tex. App.--Houston [14th Dist.] 2009, pet. filed). ("It is well-established
that corporations can act only through human agents and that, when an officer or
corporate representative acts on behalf of a corporate entity, that act is the act of the
corporation itself."); see also Martin v. Martin, Martin & Richards, Inc., 12 S.W.3d
120, 124 (Tex. App.--Fort Worth 1999, no pet.) ("A sole shareholder or all
shareholders acting in agreement, being all the beneficial owners of corporate
property, may themselves deal with the [corporate] property [that they dispose of by
contract], so long as the rights of creditors are not prejudiced. In such a case, only the
corporation's creditors are in a position to complain of the lack of proper action by
the board of directors.") (citing Newman v. Toy, 926 S.W.2d 629, 631 (Tex.
App.--Austin 1996, writ denied)); cf. Tex. Bus. Corp. Act Ann. art. 2.30-1(A)(6)
(Vernon 2003) (shareholder agreements concerning corporate property); Tex. Bus.
Org. Code Ann. § 21.101(a)(8) (Vernon 2008) (same).
10. Charles and Texas Staffing argue that Garry cannot assert now that the Agreement is
ambiguous because he never pleaded ambiguity below. However, even when both
parties agree that their contract is unambiguous and merely disagree as to its
unambiguous meaning, a court may independently conclude that the contract is
ambiguous. See White v. Moore, 760 S.W.2d 242, 243 (Tex. 1988); Coker v. Coker,
650 S.W.2d 391, 394 (Tex. 1983). Thus, in an appeal from a summary-judgment
ruling, "[a] court may conclude that a contract is ambiguous even in the absence of
such a pleading by either party." Sage St. Assocs. v. Northdale Constr. Co., 863
S.W.2d 438, 445 (Tex. 1993).
11. Garry pleaded this claim against Kenneth, too, but, as explained above, the summary
judgment disposing of his individual liability must be affirmed.
12. On appeal, Garry cites evidence from his summary-judgment response that he argues
raised a fact issue on the challenged implied-in-fact contract element of mutual
consent. Specifically, he argues that evidence that he produced showing that Charles
was the Chairman of the Board of F.W. Services indicates that he "had the authority
to bind F.W. Services to a contract" and that his knowledge thus "is imputable to F.W.
Services." However, Garry's summary-judgment response did not bring to the trial
court's attention either this evidence or this argument, as was his burden. See Aleman
v. Ben E. Keith Co., 227 S.W.3d 304, 309 (Tex. App.--Houston [1st Dist.] 2007, no
pet.) (indicating that non-movant's burden is to point out evidence raising a fact
issue); Springer v. Am. Zurich Ins. Co., 115 S.W.3d 582, 585 (Tex. App.--Waco
2003, pet. denied) ("If it is [the non-movant's] assertion that the Commission decision
constitutes evidence that would defeat the no-evidence motion for summary judgment,
it was her responsibility to present such an assertion to the trial court through her
response."). The only place in his response that Garry relied on this particular
evidence was in response to an unrelated summary-judgment ground that did not
concern Charles's authority to bind F.W. Services. Accordingly, we may not consider
Garry's argument on appeal. See Holloway v. Tex. Elec. Util. Constr., Ltd., 282
S.W.3d 207, 212 (Tex. App.--Tyler 2009, no pet.) (holding that no-evidence
summary-judgment response was inadequate to raise fact issue when party failed to
discuss challenged element anywhere in response). Compare Johnson v. Brewer &
Pritchard, P.C., 73 S.W.3d 193, 207-08 (Tex. 2002) (concluding that non-movant's
response was adequate despite not expressly discussing challenged claim because,
under other portions of response, party referred briefly to it and discussed pertinent
evidence).
13. He also sought disgorgement of profits and other remedies that he has abandoned on
appeal.
14. In fact, Garry did not respond to the summary-judgment motion's challenge to his
claims for common-law and statutory fraud arising out of the intentional transfer of
former Worldwide assets to Kenneth and F.W. Services, and he has abandoned these
claims on appeal.
15. On appeal, Garry also asserts that a fiduciary duty arose due to his and Charles's
being "long standing family friends," their having "repeated business contacts," and
their "often work[ing] together." However, we do not read Garry's petition as
alleging these bases for a fiduciary duty. And even if it did, Charles and Texas
Staffing moved for no-evidence summary judgment on the basis that no fiduciary
relationship existed; Garry neither argued that their friendship or past business
relationship created a duty nor pointed out evidence in support; and Garry's response
instead referenced the oral agreement for Charles to hold Garry's commissions. 
Accordingly, Garry cannot now rely on the parties' friendship and lengthy business
contacts as bases for reversal. See Tex. R. Civ. P. 166a(i) & cmt.
16. See Via Net v. TIG Ins. Co., 211 S.W.3d 310, 313 (Tex. 2006) ("When [the plaintiff-nonmovant] asserted the discovery rule for the first time in its summary judgment
response, [the defendant-movant] had two choices: it could object that the discovery
rule had not been pleaded, or it could respond on the merits and try the issue by
consent.").
17. See Via Net, 211 S.W.3d at 313 ("When [the plaintiff-nonmovant] asserted the
discovery rule for the first time in its summary judgment response, [the defendant-movant] had two choices: it could object that the discovery rule had not been pleaded,
or it could respond on the merits and try the issue by consent.") (emphasis added). 
We note that even if this theory could be considered tried by consent for Kenneth and
F.W. Services, it could not for Charles and Texas Staffing, who did not assert it in
their summary-judgment response.
18. Cary testified that he had done "some work on behalf of [Kenneth] for the benefit of
his San Antonio entity," San Antonio Staffing, before he had left F.W. Services, but
that San Antonio Staffing "fell under a different corporate umbrella than what [he]
was competing against." Kenneth's summary-judgment affidavit did not explain the
relationship, if any, between San Antonio Staffing and F.W. Services. However,
Kenneth and F.W. Services also produced Diamond's deposition testimony, in which
she testified that in 1987 she had been "transferred by Charles Joekel" to San Antonio,
where she worked for both "Pacesetter Personnel" and for San Antonio Staffing. In
that same testimony, she also responded affirmatively to a question asking whether
Garry had suggested to her, before she left F.W. Services in 1996, that she "should
leave and set up a competing business with Pacesetter in San Antonio." (Emphasis
added.) This is some evidence, when viewed in the light most favorable to Kenneth
and F.W. Services, that F.W. Services d/b/a Pacesetter Personnel conducted business,
through San Antonio Staffing or otherwise, in San Antonio. 
19. Kenneth and F.W. Services argue that Chad and his three corporations can be held
liable for the actions of Huntington under the single-business-enterprise theory. They
did not allege this liability basis in their counter-petition, but did raise it--without
objection, but also without joinder by the movants--in their summary-judgment
response. Assuming without deciding that this liability theory could be viewed as
having been tried by consent, see Via Net, 211 S.W.3d at 313, the Texas Supreme
Court has since rejected its validity. See SSP Partners v. Gladstrong Investments
(USA) Corp., 275 S.W.3d 444, 456 (Tex. 2008). Accordingly, the evidence that
Kenneth and F.W. Services produced in support of this responsive theory did not
constitute any evidence of Chad's or his corporations' acts.
20. See Esty v. Beal Bank S.S.B., No. 05-08-00038-CV, 2009 WL 2506338, at *8 (Tex.
App.--Dallas Aug. 18, 2009, no pet. h.) (holding that challenge to trial court's having
signed orders striking summary-judgment evidence after denial of motion for new
trial was waived because both parties had agreed that trial court could wait to rule on
objections until after summary-judgment ruling and because trial court had earlier
signed another post-judgment order expressly stating that it had considered, at time
that it had ruled on summary-judgment motion, only competent and admissible
evidence); Crocker v. Paulyne's Nursing Home, Inc., 95 S.W.3d 416, 420 (Tex.
App.--Dallas 2002, no pet.) (holding that order sustaining evidentiary objections
signed 89 days after summary-judgment ruling was effective to memorialize
evidentiary ruling made before summary-judgment order's signing, that court had
considered "evidence admitted for consideration" and parties' objections).
21. The Honorable Tim Taft, who retired from the First Court of Appeals effective June
1, 2009, continues to sit by assignment for the disposition of this case, which was
submitted on June 24, 2008.